**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 19 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

DANIEL WATSON, as a minor by
his next friends, JIM and SANDRA
WATSON,

     Plaintiff - Appellant,

v.

ROBERT D. BECKEL, Superintendent,
New Mexico Military Institute, SETH R.
ORELL, Commandant of Cadets, New
Mexico Military Institute, ANTONIO
PINO, CHRISTOPHER CORTEZ,
Employees of the New Mexico Military
Institute, all in their individual capacities,

     Defendants - Appellees.

No. 99-2290

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-98-551-JC/LFG)**

---

Warren F. Frost, Tucumcari, New Mexico, for the appellant.

Richard E. Olson (Rebecca N. Johnson with him on the brief), of Hinkle, Hensley, Shanor
& Martin, L.L.P, Roswell, New Mexico, for the appellees.

---

Before **TACHA** and **LUCERO**, Circuit Judges, and **LUNGSTRUM**, District Judge.[*]

---

    [*] The Honorable John W. Lungstrum, United States District Judge for the District
of Kansas, sitting by designation.

**LUNGSTRUM**, District Judge.

After Daniel Watson was expelled from the New Mexico Military Institute, he sued officials at the Institute under 42 U.S.C. § 1983 alleging that he was denied due process. The district court granted summary judgment for the defendants on the due process claim and denied Mr. Watson's motion for leave to amend the complaint to add an equal protection claim. Mr. Watson appeals. We exercise jurisdiction pursuant to 28 U.S.C. § 1332 and affirm the district court's order.

Background

Daniel Watson enrolled as a ninth grade cadet at the New Mexico Military Institute on January 3, 1998. In February 1998, Mr. Watson's roommate at the Institute complained to Lieutenant Antonio Pino, an official at the Institute, that Mr. Watson and several other cadets had assaulted him. Mr. Watson was required to change rooms and an investigation into the allegation was initiated. Mr. Watson's mother called Lieutenant Pino about the room change and was told that her son had assaulted his roommate and that the assault was motivated by racism. Major Christopher Cortez led the investigation and interviewed numerous cadets, including Mr. Watson. Major Cortez told Mr. Watson that the alleged assault was the subject of the investigation and Major Cortez asked Mr. Watson questions about the assault and its motive.

Major Cortez prepared a written report and, on the basis of the report, the Commandant of Cadets, Seth Orell, decided to convene a Major Disciplinary Board to hear the allegations against Mr. Watson and two other cadets allegedly involved in the assault. The Commandant appointed Lieutenant Pino as president of the board and Major Cortez as the recorder. Henry Borom, a Troop Leadership Advisor at the Institute, informed Mr. Watson of the decision. Mr. Borom told Mr. Watson that the investigating officer had recommended that he go before a Major Disciplinary Board for the alleged assault. The same day, Mr. Borom called Mr. Watson's mother and told her that her son was to appear before a disciplinary board for the assault. On March 4, 1998, Lieutenant Pino presented Mr. Watson with a Major Disciplinary Notice informing him of the time and date of the hearing and that he was "permitted to have an Advisor/Assistant from the staff, faculty, or Corp. of Cadets, to call witnesses on my behalf, to testify or remain silent without prejudice to be drawn therefrom." The notice did not specify the charges against Mr. Watson.

Mr. Watson arrived at the hearing without an "Advisor/Assistant." Major Cortez presented the evidence against Mr. Watson to the board, including five witnesses and numerous exhibits. Mr. Watson spoke to the board, but did not call witnesses on his behalf or introduce other evidence. Mr. Watson admitted to the board that he assaulted his roommate and that he was motivated by the fact that his roommate was Hispanic and Catholic. The board voted unanimously to expel Mr. Watson.

Commandant Orell met with Mr. Watson to inform him of the board's decision. Mr. Orell told Mr. Watson of his right to appeal the board's decision and Mr. Watson requested an appeal to the Superintendent. Robert Beckel, the Institute Superintendent, reviewed the evidence and upheld the board's decision to expel Mr. Watson.

On May 8, 1998, Mr. Watson filed this lawsuit against officials at the Institute under 42 U.S.C. § 1983 alleging that he was denied due process. The district court subsequently granted summary judgment for the defendants on the due process claim and denied Mr. Watson's motion for leave to amend the complaint to add an equal protection claim on the ground that the amendment would be futile.

Standards of Review

We review a district court's grant of summary judgment de novo, applying the same legal standard used by the district court. *See Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, we review the evidence and draw inferences in the light most favorable to the nonmoving party. *See Byers*, 150 F.3d at 1274.

This court reviews de novo a district court's refusal to grant leave to amend a complaint based on the court's conclusion that the amendment would be futile. *See Jefferson County School Dist. No. R-1 v. Moody's Investor's Services, Inc.*, 175 F.3d 848, 858-59 (10th Cir.1999). A proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment. *Id*; *Bauchman v. West High School*, 132 F.3d 542, 561 (10th Cir. 1997).

Due Process

Mr. Watson argues that he was denied due process because he received inadequate notice.[1] Notice was inadequate, according to Mr. Watson, because the written notice he received did not specify the charges against him. Mr. Watson also alleges that the board based its decision, in part, on the finding that Mr. Watson was a racist and argues that notice was inadequate because he was not told that he was charged with racism.

The Supreme Court decision in *Goss v. Lopez*, 419 U.S. 565 (1975), sets the standard for procedural due process owed to students facing short-term school suspensions:

---

[1] The appellees do not contest Mr. Watson's assertion that he had a property or liberty interest in his education at the Institute and was owed due process under the Fourteenth Amendment.

>Due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

*Goss*, 491 U.S. at 581. The *Goss* court explained that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id*. at 584. Mr. Watson, therefore, was entitled to at least the amount of due process described by the *Goss* court.

The Supreme Court has not answered the question of what, if any, additional process is required for a long-term suspension or expulsion. The *Goss* decision, however, provides some guidance. The Court explained that "the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved. *Id*. at 579. The students' interest in "unfair or mistaken exclusion from the educational process" must be balanced against the school's interest in "discipline and order." *Id*. The Court emphasized that "the risk of error should be guarded against if that may be done without prohibitive costs or interference with the educational process." *Id*. at 580.

Other circuits that have considered the requirements of due process in cases of long-term suspension or expulsion have applied the balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine if additional process was required. *See Palmer v. Merluzzi*, 868 F.2d 90, 95 (3d Cir. 1989); *Newsome v. Batavia Local School Dist.*, 842 F.2d 920, 923-34 (6th Cir. 1988); *Gorman v. University of Rhode Island*, 837

F.2d 7, 14 (1st Cir. 1988); *Nash v. Auburn University*, 812 F.2d 655, 660 (11th Cir. 1987). Under *Mathews*, a court must balance three factors: (1) the private interest that will be affected by the official action, (2) the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the fiscal and administrative burden, that the additional or substitute procedural requirements would entail. *Mathews*, 424 U.S. at 334-35. The three-factor test from the *Mathews* decision, decided one year after *Goss*, is appropriate for determining when additional procedure is due because the test crystallizes the balancing of student interests against school interests suggested in the *Goss* decision.

Mr. Watson's argument that he received insufficient notice because the written notice provided to him failed to list the specific charges fails under the *Mathews* balancing test. The *Goss* decision specifies that a student may be provided with either oral or written notice of the charges against him. It is uncontroverted that Mr. Borom told Mr. Watson that he was to appear before the board for a hearing on the alleged assault, that Mr. Watson knew the subject of the investigation and that Mr. Watson understood that the hearing was about the assault. In addition, Mrs. Watson was told by Lieutenant Pino that her son was being investigated for the assault of his roommate and that the assault was racially motivated. Mr. Watson received adequate oral notice of the charges against him as well as what the district court termed "constructive notice"-- knowing the allegations that were the subject of the investigation and understanding that the hearing

-7-

was about those allegations. The issue, therefore, is whether there would have been any additional value in listing the charges in the written notice and comparing that value to the burden that would be placed upon the Institute in complying.

Despite the inadequacy of the written notice provided, Mr. Watson was well aware of the allegations that were the subject of the hearing. "All that is necessary" to satisfy due process "is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." *Mathews*, 424 U.S. at 349 (quoting *Goldberg v. Kelly*, 397 U.S. 254, 268-69 (1970)). The notice given to Mr. Watson satisfied this requirement because it allowed Mr. Watson to prepare for the hearing and defend against the charges. Because Mr. Watson already knew the allegations he faced, he would have received little or no additional benefit from a written notice that specified the charges against him. While the burden of requiring schools to provide written notice specifying charges is slight, in this case, requiring such notice in addition to oral and constructive notice was not necessary to ensure a fair proceeding.[2]

Mr. Watson's argument that notice was insufficient because he was not told that he was charged with racism also fails under the *Mathews* balancing test. The board's finding

---

[2] The Court explained in *Mathews* that the "ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Mathews*, 424 U.S. at 348. Judicial intervention to require written notice of charges when a student already knows the charges is not necessary to ensure fairness.

that the motive for the assault was racism does not constitute an independent charge against Mr. Watson. The record does not indicate that the board expelled Mr. Watson because he was racist, but that he was expelled for the assault. Mr. Watson does not cite, and this court does not find, any precedent for the proposition that notice must include all suspected motives for a student's actions.[3] Such extensive notice is not even due in a criminal trial.[4] The record suggests that Mr. Watson knew in advance of the hearing that the suspected motive for the assault was racism.[5] Mr. Watson was present to hear the evidence indicating that the assault was racially motivated and had the opportunity to respond. The record of the hearing indicates that Mr. Watson said that racism was his motive and that Mr. Watson's testimony constituted the majority of the evidence about

---

[3] In *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir. 1961), the court held that the student "should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies." The purpose of this requirement was to allow the student an opportunity to respond to the charges because he was not allowed to be present for the testimony. The *Dixon* court did not suggest that this information was necessary to provide adequate notice.

[4] The *Mathews* Court emphasized that due process does not require the "wholesale transplantation" of the judicial rules of procedure to administrative hearings. *Mathews*, 424 U.S. at 348. Certainly due process does not require notice more extensive be provided to students than what is due a criminal defendant.

[5] Mr. Watson's mother was told by Mr. Boron in advance of the hearing that racism was suspected as the motive for the assault. Mr. Watson was questioned by Major Cortez about the assault and the motive for the assault. The investigation report, prepared by Major Cortez, suggested that racism was the motive for the assault. While the report does not specify if Mr. Watson said that racism was his motive, it seems unlikely that Mr. Watson was unaware that Major Cortez and other cadets believed that the assault was racially motivated.

racism. Mr. Watson, therefore, was not prejudiced by not being told by officials that they suspected racism was his motive. On the other hand, the burden on schools to provide notice of suspected motives would be heavy. Schools would be required to investigate possible motives for student misbehavior and set out those theories in the student's notice. Should evidence be presented at a hearing that suggests a motive not included in the notice, the student would have grounds to challenge any disciplinary action. This heavy burden easily outweighs any benefit of requiring that notice include suspected motives for student behavior.[6]

In order to establish a denial of due process, a student must show substantial prejudice from the allegedly inadequate procedure. *See, e.g., United States v. Kennedy*, 64 F.3d 1465,1473 (10th Cir. 1995)*, Moore v. Reynolds*, 153 F.3d 1086, 1111 (10th Cir. 1998)*, Keough v. Tate County Board of Ed.*, 748 F.2d 479 (5th Cir. 1984). Mr. Watson admitted to the board that he assaulted his roommate and that he did so because his roommate was Hispanic and Catholic. Because Mr. Watson candidly admitted his guilt, Mr. Watson was not prejudiced by a lack of notice. *See Gross*, 419 U.S. at 581 (explaining that due process requires that "the student be given oral or written notice of the charges against him and, *if he denies them*, an explanation of the evidence the

---

[6] The *Goss* court emphasized that the burden of imposing "trial-type procedures" on schools "might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness." This would be the case if schools were required to give notice of possible motives for disciplinary violations, such as racism.

authorities have and an opportunity to present his side of the story") (emphasis added).

Additional notice would not have allowed Mr. Watson to better defend the allegations.

Mr. Watson, therefore, failed to establish a due process violation. *See Keough v. Tate County Board of Ed.*, 748 F.2d 479 (5th Cir. 1984) ("there was substantial evidence to support the district court's finding that Keough admitted the charges and therefore his suspension did not result from a procedural due process deprivation."); *Trujillo v. Taos Municipal Schools*, 1995 WL 868603 at *9 (D.N.M. Aug. 10, 1995) ("In light of Student's admission of the offense, no due process infringement could be found even if the charges against him were not included on the notice of hearing."); *Boster v. Philpot*, 645 F. Supp. 798, 804 (D. Kan. 1986) (holding that even if procedure was inadequate, "the students would still be unable to show that they suffered any prejudice so as to establish a denial of due process. By admitting their guilt, the plaintiffs waived their right to a hearing."). Also, because Mr. Watson received proper notice regarding the charge of assault and was expelled for the assault, Mr. Watson would not be prejudiced by the board justifying expulsion on additional grounds. *See Smith v. Severn*, 129 F.3d 419, 428 (7th Cir. 1997) (holding that so long as a student receives proper notice of a charge and is suspended on the basis of that charge, justifying the suspension by finding additional violations does not constitute a due process violation).

Mr. Watson requests that the court order "that upon the proposed expulsion or long-term suspension of any student attending a state-supported educational institution,"

the student must be afforded written notice specifying the charges, legal counsel, the presentation of evidence, the right to cross-examine witnesses, an impartial board, a transcript of the hearing, and independent review of the decision. Not only does precedent indicate that due process does not require all of these rights, *see, e.g., Gorman v. University of Rhode Island*, 837 F.2d 7, 16 (1st Cir. 1988) (rejecting the argument that due process requires the right to counsel, to cross-examine witnesses, or to have a transcript of the hearing); *Newsome v. Batavia Local School Dist.*, 842 F.2d 920, 924 (6th Cir. 1988) (holding that due process does not require the right to cross-examine witnesses or that investigating officials be excluded from the deliberation process), but Mr. Watson lacks standing to request such an order because he has not demonstrated that he will be subject to future disciplinary procedures, *see Beattie v. United States*, 949 F.2d 1092, 1093 (10th Cir. 1991) ("plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured in the future"); *Gebert v. Hoffman*, 336 F. Supp. 694,697 (E.D. Penn. 1972) (holding that students lacked standing to challenge the rules governing suspension because the students "failed to establish any reasonable probability of [future] injury to them as a result of the continued existence and use of those rules."), and because Mr. Watson did not request an injunction from the district court or raise the issue of a student's entitlement to these rights, this court will not consider the request upon appeal, *see Unicover World Trade Corp. v. Tri-State Mint, Inc.*, 24 F.3d 1219, 1221 (10th Cir.1994).

Because the uncontroverted facts presented to the district court show that Mr. Watson received adequate notice of the charges against him, summary judgment was properly granted for the defendants.

Equal protection

Mr. Watson moved the district court for leave to amend his complaint to include an equal protection claim, arguing that equal protection is violated because students at other New Mexico schools are given written notice specifying charges and a hearing with more rights than were afforded to Mr. Watson. For support, Mr. Watson pointed to the New Mexico Department of Education regulations that, for long-term suspensions and expulsions, require that a student be provided detailed written notice and a hearing with the right to counsel and the right to cross-examine witnesses. The district court denied Mr. Watson's motion on the grounds that it would be futile. According to the district court, because Mr. Watson was afforded sufficient due process, he has no basis for an equal protection claim under the rational basis test.

Mr. Watson argues that the district court was wrong because "there can be no rational basis" for having different procedural safeguards among students in the same state. For support of his argument, Mr. Watson cites the Seventh Circuit decision in *Betts v. Board of Ed. of the City of Chicago*, 466 F.2d 629 (7th Cir. 1972). In *Betts*, the plaintiff argued "that she was denied equal protection of the laws in that the procedural

-13-

safeguards afforded to her were not comparable to those required by the Illinois statutes for students in areas other than Chicago." *Id*. at 632. The Seventh Circuit did not rule on the issue because the complaint did not include an equal protection claim. *Id*. The court, however, suggested that, upon amendment of the complaint, the district court "may well decide that the equal protection clause has been violated by affording lesser procedural safeguards to Chicago students in disciplinary proceedings than in other Illinois school districts, unless the defendants can show the distinction to be rationally related to the achievement of a legitimate state goal." *Id*.

Because Mr. Watson does not claim that he is a member of a suspect class or assert the deprivation of a fundamental right, his equal protection claim fails if the difference between procedure afforded students at the Institute and other state schools is rationally related to a legitimate state interest. *See Vacco v. Quill*, 521 U.S. 793, 799 (1997) (holding that unless a distinction burdens a fundamental right or targets a suspect class, courts will uphold it if it is rationally related to a legitimate end); *West v. Derby Unified School Dist. No. 260*, 206 F.3d 1358, 1365 (10th Cir. 2000) ("public school students are not a suspect class under the Equal Protection Clause"). The appellees assert that the difference in procedure is rationally related to a legitimate state interest in providing a military education to students at the Institute and cite *Stilianos v. Board of Trustees of Massachusetts Maritime Academy*, 1983 U.S. Dist. LEXIS 13529 (D. Mass. Sept. 22, 1983) for support of the proposition that cadets at military institutions are taught to "live

up to high standards of conduct" and that, consequently, "such schools have greater freedom in fashioning their disciplinary procedures than do other schools."

The principle difference between a military school and other schools is the degree of discipline imposed on students. Students, like Mr. Watson, and their parents generally choose a military education for this reason. The punishments for student misbehavior and procedures for imposing those punishments are different than those followed by other schools. This difference is a fundamental ingredient of a military education. *See Hagopian v. Knowlton*, 470 F.2d 201, 204 (2d Cir. 1972) (recognizing that "the [United States Military] Academy's rigorous and exacting standards of discipline, behavior and personal decorum for cadets" are "standards which have traditionally been recognized as vital elements of a training program designed to develop the mind, body, and character of prospective career officers."). Disciplinary proceedings at the Institute, therefore, should not be expected to mirror that of other public schools which have different codes of conduct and methods of discipline.

In line with its objective of providing a military education to its students, the Institute modeled Mr. Watson's hearing after a military court-martial.[7] Because of the

---

[7] Federal courts have long recognized that due process does not require that military courts-martial mirror a criminal trial. *See Weiss v. United States*, 510 U.S. 163, 177-78 (1994). Courts review military disciplinary proceedings with great deference and find a violation of due process only if "the factors militating in favor of " the additional procedure "are so extraordinarily weighty as to overcome the balance struck by Congress." *Id*.

military's unique code of conduct and methods of discipline, the fact that military personnel are subject to different proceedings and different punishments than civilians does not constitute an equal protection violation. *See Parker v. Levy*, 417 U.S. 733, 743 (1974) ("This Court has long recognized that the military is, by necessity, a specialized society separate from civilian society. We have also recognized that the military has, again by necessity, developed laws and traditions of its own during its long history. . . . the Court has approved the enforcement of those military customs and usages by courts-martial from the early days of this Nation.").[8] Just as military courts-martial proceedings for service persons are rationally related to the military's culture and methods of discipline, the Institute's choice to model the hearing after a court-martial is rationally related to its objective of instilling military culture and discipline in its students.[9] Because the Institute had a rational basis for its choice of procedure, Mr. Watson has no

---

[8] *See also United States v. Gray*, 37 M.J. 751, 718 (A. Ct. Crim. App. 1993) (holding that it is not an equal protection violation that service members, unlike civilians, are not entitled to have their cases reviewed by Article III judges); *United States v. Curtis*, 28 M.J. 1074, 1085 (N-M. Ct. Crim. App. 1989) (holding that it is not a denial of equal protection to subject service members to the death penalty while civilians are not subject to the death penalty for the same crime).

[9] A military education is unique and procedures for imposing discipline "which appear harsh in the abstract to Judges more attuned to adversary civilian trials may prove entirely reasonable within the confines of Academy life." *Wasson v. Towbridge*, 382 F.2d 807, 812 (2d Cir. 1967). Due process, therefore, requires only that a student at a military school "be given a fair hearing at which he is appraised of the charges against him and permitted a defense." *Id*.

basis for an equal protection claim and the district court's decision that an amendment would be futile was correct.

The district court's order granting summary judgment and denying leave to amend the complaint, therefore, is AFFIRMED.